*Pourkavoos v. Town of Avon*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

# SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007 IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 3rd day of September, two thousand twenty.

PRESENT:
>PIERRE N. LEVAL,
>SUSAN L. CARNEY,
>>*Circuit Judges*,
>TIMOTHY C. STANCEU,
>>*Judge.**

———————————————————————

KHOSRO POURKAVOOS, MD AND MARIAM
HAKIM-ZARGAR, MD, MA, MPH, FAOOS,

>*Plaintiffs-Appellees*,

>>v.                                      No. 18-2777

TOWN OF AVON, EDWARD ESPINOZA,
DETECTIVE, AND MARK RINALDO, CHIEF,

>*Defendants-Appellants.*

———————————————————————

FOR APPELLANTS:                     PATRICK D. ALLEN,
                                    Karsten & Tallberg, LLC, Rocky Hill, CT.

---

* Chief Judge Timothy C. Stanceu, of the United States Court of International Trade, sitting by designation.

FOR APPELLEES:                                    MORGAN P. RUECKERT, Shipman &
                                                  Goodwin LLP, Hartford, CT.

Appeal from an order of the United States District Court for the District of Connecticut (Covello, *J.*).

**UPON DUE CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the order entered on September 13, 2018, is **AFFIRMED**.

Edward Espinoza, a police detective in the Town of Avon, Connecticut (the "Town"), appeals from an order of the United States District Court for the District of Connecticut (Covello, *J.*) denying his motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, in which he asserted the defense of qualified immunity.[1] We assume the parties' familiarity with the underlying facts, procedural history, and arguments on appeal, to which we refer only as necessary to explain our decision to affirm the District Court's order. The factual statement set forth below is drawn from the allegations of the complaint and the documents integral to that complaint.[2]

---

[1] For convenience, we refer primarily to Pourkavoos and Espinoza as the parties in this appeal. Although Pourkavoos's wife is a named plaintiff and nominal appellee, her claim (loss of consortium) is not at issue here, where Defendants-Appellants raise only the issue whether Espinoza is entitled to the defense of qualified immunity.

[2] The parties agree that the sworn statements of, and Espinoza's notes of the interviews with, three complainant patients of Pourkavoos, as well as the arrest warrant affidavits, were incorporated by reference into the complaint. Because we agree that those documents were properly before the District Court in connection with the Rule 12(c) motion for judgment on the pleadings, we refer to them in this Order. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (discussing which documents district courts may consider when deciding motions to dismiss, which are governed by same standard as motions for judgment on the pleadings).

The parties disagree, however, about the proper treatment of the transcript of an interview of Pourkavoos that Espinoza conducted at the Avon Police Department after the search of Pourkavoos's office was conducted but before Pourkavoos was charged. Specifically, throughout this litigation, Espinoza has sought to rely on statements made by Pourkavoos during that interview about various medical examinations he did or did not conduct with respect to the complainant patients. *See, e.g.*, Sealed App'x 328 (Defendants' Reply in Support of Motion for Judgment on the Pleadings at 2, *Pourkavoos v. Town of Avon*, No. 17-cv-73 (D. Conn. Sept. 22, 2017), ECF No. 43). Pourkavoos, however, asserts that the interview transcript lies outside of the pleadings because it was not referred to or quoted in the complaint. *See* Sealed App'x 446-47 (Plaintiffs'

2

This action stems from a complaint made by a woman who alleged that the lead plaintiff, Dr. Khosro Pourkavoos, sexually assaulted her during medical appointments at his practice in Avon. That complaint led to two additional complaints, as described below.

The first woman ("Patient 1") took her complaint to the Avon Police Department (the "APD") on June 27, 2013. Defendant Espinoza was assigned to investigate the matter. As an initial step, he interviewed Patient 1 on July 8, 2013. During the interview, Patient 1 stated that: Pourkavoos touched her vaginal area at a May examination for a severe rash, despite her insistence that the rash was not in her vagina; at the same appointment, Pourkavoos pushed and squeezed her buttocks and breasts; and, at a June follow-up appointment for weakness, anemia, and temporary periodic paralysis or totally numb limbs, Pourkavoos informed her that he was going to check her for constipation and then simultaneously digitally penetrated her anus and her vagina.[3] After the July 8 interview, Espinoza contacted both Patient 1's psychiatrist and an advocate at the Susan B. Anthony Crisis Center in Torrington, Connecticut. (Patient 1 said she had called the Center's hotline

---

Surreply in Opposition to Defendants' Motion for Judgment on the Pleadings at 2-3, *Pourkavoos v. Town of Avon*, No. 17-cv-73 (D. Conn. Oct. 5, 2017), ECF No. 47).

We understand Espinoza to urge on appeal that, notwithstanding the case's procedural posture, this Court may consider the Pourkavoos interview transcript in order to comply with what he characterizes as a "directive of the Supreme Court": that courts should strive to resolve questions of qualified immunity as soon as possible in the course of litigation. Appellants' Br. at 16. But any such "directive" does not—and could not—override basic rules of civil procedure such as what courts may do when presented with materials outside of the pleadings on a motion to dismiss or a motion for judgment on the pleadings. *See, e.g.*, Fed. R. Civ. P. 12(d). Thus, in this case, although the District Court did not state in its opinion that the Pourkavoos interview transcript lay outside the scope of the pleadings, it did not rely on this extrinsic document in its decision. Properly so. Unlike the complainant patients' interview transcripts, the Pourkavoos interview transcript was not attached to the complaint as an exhibit, incorporated in it by reference, or heavily relied upon by the plaintiff such that it became integral to the complaint. *See generally Chambers*, 282 F.3d at 153. Therefore, we do not consider this document further, except to note that we expect it may be considered on summary judgment.

[3] Patient 1's medical charts indicated a history of low back pain and chronic constipation, and while Pourkavoos was squeezing her breasts, she told him that she had a lump in her breast and had been previously diagnosed with fibrocystic disease.

number to discuss the alleged assault). Each confirmed that Patient 1 had recently reported to them such allegations against Pourkavoos.[4]

Espinoza then applied for and obtained a search warrant for Pourkavoos's office and, on August 9, 2013, executed that warrant, seizing Patient 1's medical chart. Following the warrant's execution, Espinoza interviewed Pourkavoos, who consistently maintained that "any medical treatment and examination" he provided was "for a bona fide medical purpose."[5] App'x 16-17 (Complaint). Pourkavoos also allegedly offered to Espinoza "extensive explanation[s]," consistent with contemporaneous medical records then in Espinoza's possession, for the medical procedures that he had performed on the complainant patients. App'x 19 (Complaint).

By way of additional research into Pourkavoos, Espinoza conducted internet searches of online physician-rating websites. He found two negative posts mentioning Pourkavoos and was able to obtain a state *ex parte* order for subscriber information regarding one of those posts. Espinoza then contacted the person who posted that negative review. She said that she wrote the post on behalf of her daughters ("Patient 2" and "Patient 3"). Both Patient 2 and Patient 3 agreed to speak to Espinoza.

Patient 2 reported that, sometime between late 2012 and early 2013, she had scheduled an appointment with Pourkavoos for back pain that was "shooting down [her] butt into [her] leg" and that, during the examination, Pourkavoos was "pushing" in those areas, which made her uncomfortable. App'x 28-31 (internal quotation marks omitted) (Complaint, quoting Patient 2's interview). She further recalled that, during this examination, Pourkavoos, without permission, pulled down her pants, exposing her buttocks, and that she tried to pull her pants back up and explain that the pain was above her pant line. Patient 2

---

[4] Espinoza also ran a criminal record check on Patient 1 and noted that she had been arrested on a forgery charge of which she was ultimately convicted.

[5] In his complaint, Pourkavoos alleges that he "was told that if he did not consent to an interview that afternoon at the Avon Police Department, his office medical records computer also would be seized by Espinoza. Based upon this threat and the fact that the seizure would paralyze his medical practice, the Plaintiff went to the Avon Police Department that afternoon and participated in an interview related to Patient #1." App'x 16.

4

also stated that, during a separate visit scheduled because of a rash, Pourkavoos examined the area under her breasts and the "top part of [her] crotch," lifting her shirt and bra and lowering her pants, which made her feel uncomfortable. App'x 28-31 (internal quotation marks omitted) (Complaint, quoting Patient 2's interview). Patient 2 said that although she had previously told Pourkavoos that she suffered from intermittent rashes "anywhere that [she] sweat[s]," during this appointment she told Pourkavoos that the only rash she currently had was on her stomach. App'x 29 (internal quotation marks omitted) (Complaint, quoting Patient 2's interview).

According to Patient 3, during two medical appointments—one for a nerve issue and another for "what she believed was bronchitis"—Pourkavoos lifted up her bra without warning or permission. App'x 32-37 (Complaint). Patient 3 also answered in the affirmative when asked whether Pourkavoos "touched the top of [her] breast area" during both examinations, which made her feel uncomfortable. App'x 32-37 (Complaint, quoting Patient 3's interview). Each of these three women submitted affidavits confirming their statements.

On January 16, 2014, Espinoza presented two arrest warrant applications (the "Applications") to a Connecticut state court judge. The Applications contained Espinoza's own written sworn statements as follows: *With respect to Patient 1*, that (1) Patient 1 went to Pourkavoos's office to review recent blood test results and, during the appointment, Pourkavoos digitally penetrated her anus and vagina and moved his fingers "in a strange sexual manner"; (2) Patient 1 presented to Pourkavoos's office on a separate occasion "because of a skin rash," and Pourkavoos "fondled" her buttocks and breasts and "examined her vagina by spreading the vagina open"; and (3) Pourkavoos denied examining Patient 1's vaginal area or otherwise touching her inappropriately. App'x 19-26 (internal quotation marks omitted) (Complaint, quoting the Applications). *With respect to Patients 2 and 3*, that (1) Patient 2 presented to Pourkavoos's office complaining of lower back pain and Pourkavoos "used both hands to touch and fondle her buttocks"; (2) Patient 2 made a second "appointment in May of 2013 because of an allergy that had produced a rash" and, at that appointment, Pourkavoos "touched and examined the top of [her] genital and hip area" and "touched the lower [part] of her breasts"; (3) Patient 3 visited Pourkavoos's office for a

scar on her wrist and a birth mark on her back, and Pourkavoos examined her "upper chest area," "exposing her nipples"; and (4) Patient 3 made another appointment with Pourkavoos for bronchitis and Pourkavoos told her she would have to remove her sweatshirt so that he could listen to her lungs, and he "proceeded to lift her bra with one finger, fully exposing her breasts" and touched "the top areas of [her] breasts." App'x 26-37 (internal quotation marks omitted) (Complaint, quoting the Applications).

Espinoza recommended to Connecticut state prosecutors that they charge Pourkavoos with Sexual Assault in the Second and Fourth Degrees in connection with Patient 1, and Sexual Assault in the Fourth Degree in connection with Patient 2.[6] Under Connecticut law, a person commits Sexual Assault in the Second Degree when he "engages in sexual intercourse with another person . . . by means of false representation that the sexual intercourse is for a bona fide medical purpose by a health care professional." Conn. Gen. Stat. § 53a-71(a)(7). For purposes of the offense, "[p]enetration, however slight," constitutes "sexual intercourse." *Id.* § 53a-65(2).[7] A person commits Sexual Assault in the Fourth Degree when he "subjects another person to sexual contact . . . by means of false representation that the sexual contact is for a bona fide medical purpose by a health care professional." *Id.* § 53a-73a(a)(5). Critically for the latter crime, contact is only "sexual contact" when it is "for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person." *Id.* § 53a-65(3).

On January 21, 2014, a Superior Court judge and a prosecuting attorney each reviewed and signed the Applications submitted by Espinoza. Pourkavoos was arrested the following day. Over two and one-half years later, on September 22, 2016, after expert physicians—including one hired by the State of Connecticut—had examined certain of the referenced medical records and conferred about whether the "patients' presenting symptoms

---

[6] Espinoza did not seek any charges with respect to Patient 3.

[7] The definitions of the terms used in this provision of the Connecticut penal code were revised effective October 1, 2019, but the amendments are not relevant here. *See* 2019 Conn. Legis. Serv. P.A. 19-189 (H.B. 7396) (striking "[i]ts meaning is limited to persons not married to each other" from definition of "sexual intercourse"; striking similar language from definition of "sexual contact").

6

and complaints did, in fact, warrant the medical evaluations and examinations undertaken by [Pourkavoos]," the State dismissed all pending criminal charges against Pourkavoos. App'x 15.

In January 2017, Pourkavoos and his wife sued Espinoza, APD Chief Mark Rinaldo, and the Town for damages. They alleged five counts: (1) false arrest in violation of the Fourth Amendment of the U.S. Constitution as to all Defendants, because "Pourkavoos was arrested without probable cause as a result of the actions of the Defendants who created and presented a false affidavit to the Superior Court in order to have an arrest warrant issued"; (2) negligence as to all Defendants, including Rinaldo, because Espinoza's investigation and preparation of the warrant applications was negligent, Rinaldo "failed to properly supervise Espinoza," and because the Town is "legally liable for the negligence of Espinoza"; (3) indemnification as to the Town pursuant to Conn. Gen. Stat. § 7-465, because the Town "is responsible for the actions of the Defendants [that] occurred during the scope of their employment"; (4) municipal liability as to the Town pursuant to Conn. Gen. Stat. § 52-557n, because the Town "is liable for the damages suffered by Dr. Pourkavoos due to the acts of its employees"; and (5) loss of consortium as to all Defendants. App'x 40-48 (Complaint). Defendants answered and moved for judgment on the pleadings, arguing that the pleadings showed that they were entitled to qualified immunity as a matter of law. In March 2018, the District Court denied Defendants' motion. Defendants timely brought this interlocutory appeal, pressing their qualified immunity argument and contending further that dismissal of the false arrest claim against Espinoza will necessitate dismissal of the remainder of the complaint.[8]

---

[8] At the outset, we briefly consider and confirm our jurisdiction to entertain this appeal. *Tierney v. Davidson*, 133 F.3d 189, 194 (2d Cir. 1998). It is well settled that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable final decision within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Id.* (internal quotation marks omitted). Pourkavoos argues that, to the extent the District Court identified enough evidence in the record to create a genuine issue as to a material question of fact, this Court does not have jurisdiction to review that factual determination on interlocutory appeal. *E.g.*, *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996). But Espinoza contends that he is entitled to judgment on his qualified immunity defense based on the *undisputed* facts in the record. We therefore have jurisdiction to consider whether, as a matter of law, the District Court adequately and correctly addressed his qualified immunity arguments. *Cf. Tierney*, 133 F.3d at 194.

7

**DISCUSSION**

We review *de novo* a district court's denial of a motion for judgment on the pleadings under Rule 12(c), applying "the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017). This Court has admonished "[d]efendants moving to dismiss a suit by reason of qualified immunity" that they "would in almost all cases be well advised to move for summary judgment, rather than for dismissal under Rule 12(b)(6) or 12(c)." *Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013); *cf. McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) ("[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route."). Because, on a Rule 12(b)(6) or 12(c) motion, "the facts supporting the [qualified immunity] defense [must] appear on the face of the complaint," *McKenna*, 386 F.3d at 436, asserting qualified immunity as a defense in the earliest stages of litigation, before development of a relevant factual record, usually fails to result in dismissal of the complaint, *see, e.g.*, *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 191-92 (2d Cir. 2006).

The doctrine of qualified immunity balances two sets of competing public interests: (1) the importance of vindicating citizens' constitutional rights, providing compensation for the violation of those rights, and deterring government officials from such violations; and (2) the "substantial social costs" of permitting damages suits against government officials, "including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017). The doctrine shields government officials, including police officers, from personal liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In other words, officers are entitled to qualified immunity for wrongful arrest claims where probable cause to arrest existed. Further, even if it is later determined that probable

cause did *not* exist, an arresting officer is still entitled to qualified immunity "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). A defendant is not, however, entitled to qualified immunity if he "knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and . . . the allegedly false statement was necessary to the finding of probable cause." *Id.* (internal quotation marks omitted). Additionally, "[i]ntentional or reckless omissions of material information, like false statements," defeat qualified immunity. *Id.* at 871.

a. *Arguable Probable Cause*. Espinoza first asserts that he is entitled to qualified immunity as a matter of law because the facts that Pourkavoos alleges in his complaint, and those established by materials incorporated into or integral to the complaint, preclude Pourkavoos from refuting that Espinoza had at least arguable probable cause. Where, as here, an arrest warrant was issued "by a neutral magistrate," we apply a presumption of probable cause. *Id.* at 870. That presumption is refuted, however, if "an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, as where a material omission [or fabrication] is intended to enhance the contents of the affidavit as support for a conclusion of probable cause." *Id.* at 871; *see also United States v. Leon*, 468 U.S. 897, 923 (1984) (explaining that a warrant issued because judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth" does not provide probable cause).

Espinoza's contention that he did not fabricate evidence or omit material information known to him when he prepared the Applications is in stark conflict with the allegations in the complaint. Taking the complaint's allegations as true, as we must on a Rule 12(b)(6) or 12(c) motion, the "corrected" versions of the Applications—*i.e.*, the Applications supplemented with information Espinoza knew but chose to omit or cleansed of characterizations that were Espinoza's alone and inaccurately reflected the complaints that

9

he identified[9]—compel the conclusion that the omissions and fabrications are material. For example, Patient 1's severe constipation provided at least a purported "bona fide medical purpose" for the rectal exam. Conn. Gen. Stat. § 53a-71(a)(7) (defining Sexual Assault in the Second Degree to include "false representation that the sexual intercourse is for a bona fide medical purpose"). And information about the nature of Patient 2's back pain suggests a "bona fide medical purpose" for "pushing" on the buttocks. *Id.* § 53a-73a(a)(5) (defining Sexual Assault in the Fourth Degree to include "false representation that the sexual contact is for a bona fide medical purpose").

Further, the Applications do not contain *any* information regarding the "gratification" element of sexual contact relevant to the second charge. *Id.* While this last category of omission makes it somewhat doubtful that the Applications ever supported a finding of probable cause with respect to Patient 2, we see no basis to conclude that the District Court erred in determining that the "materiality of the alleged omissions or misrepresentations in the [Applications] prevent a determination of qualified immunity." App'x 134 (District Court Opinion).

What exactly was known to Espinoza when he prepared the affidavits is by its nature difficult to ascertain on a motion for judgment on the pleadings, because the officer is not entitled at this early stage of the proceedings to adduce evidence that may be unknown to the plaintiff and that may be critical to establishing the defense. The presence of material

---

[9] The complaint contains numerous detailed allegations of information that Espinoza, in the Applications, "mischaracterized, inaccurately stated and omitted." *E.g.*, App'x 22. *See generally* App'x 22-26, 28-31, 33-37 (listing mischaracterizations, inaccurate statements, and omissions with respect to Patients 1, 2, and 3). For example, with respect to Patient 1, the complaint asserts that Espinoza sexualized the medical examinations Pourkavoos performed, including by using the word "fondling" and describing Pourkavoos as "mov[ing] his fingers in a 'strange sexual manner'"—words that Patient 1 did not use during her interview with Espinoza. App'x 22. The complaint also highlights Espinoza's failure to include information about Patient 1's medical and criminal history, including but not limited to the facts that she was "a documented drug user" who had been "convicted of forgery"; had a "history of constipation, chronic blood in her stool, [and a] family history of colon cancer"; and had been diagnosed with certain psychological disorders for which she took a number of medications. App'x 22-26. The complaint contains similar allegations with respect to Patients 2 and 3, including that Espinoza omitted from the Applications complete and accurate medical symptoms that led those patients to seek an examination and that could have explained certain procedures Pourkavoos performed, and asked leading questions intended to portray those procedures as inappropriate (including sexually). App'x 28-31, 33-37.

omissions in the Applications further clouds the question whether Espinoza will be entitled to qualified immunity in this action.

b. *Clearly Established Law.* Espinoza next contends that he is entitled to qualified immunity because Pourkavoos "has pointed to no decision from this Court or the United States Supreme Court" that would have put Espinoza on notice that his conduct in pursuing a prosecution of Pourkavoos and causing his arrest was unlawful. Appellants' Reply Br. at 7-10. But Espinoza's articulation of the legal standard, in which he would require a case that "involv[es] a warrant application under similar facts and circumstances, regarding similar charges against a physician" to show "clearly established law," Appellants' Br. at 28, is far too narrow. The Supreme Court has held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002). Indeed,

> general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarify to the specific conduct in question, even though the very action in question has [not] previously been held unlawful. . . . The easiest cases don't even arise. There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages [or criminal] liability.

*United States v. Lanier*, 520 U.S. 259, 271 (1997) (internal quotation marks omitted); *cf. Abbasi*, 137 S. Ct. at 1867 ("It is not necessary, of course, that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point. But in light of the pre-existing law, the unlawfulness of the officer's conduct must be apparent." (internal quotation marks omitted)). There need not be "a case directly on point for a right to be clearly established," so long as existing precedent has "placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks omitted). Thus, we have cautioned against "convert[ing] the fair notice requirement into a presumption against the existence of basic constitutional rights." *Edrei v. Maguire*, 892 F.3d 525, 540 (2d Cir. 2018). In *Edrei*, we held that our rule was clearly established "that using force in a crowd control context

11

violates due process" and as such that it was sufficient to put police officers on notice of the unlawful nature of using a "long-range acoustic device" that could produce volumes unsafe for human ears during a protest. *Id.* at 529-30, 540-44. To hold otherwise, we explained, would be akin to "saying police officers who run over people crossing the street illegally can claim immunity simply because we have never addressed a Fourteenth Amendment claim involving jaywalkers." *Id.* at 540. So too here.

Our precedent establishes, and it should come as no surprise, that officers may not knowingly omit information likely to influence a judge or a prosecutor's probable cause determination. *E.g.*, *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015) (finding defendants not entitled to qualified immunity when they knowingly omitted material information from billing summaries that they created when prosecuting Medicaid fraud); *see also Richards v. City of New York*, 2003 WL 21036365, at *16 (S.D.N.Y. May 7, 2003) (holding "police may not purposely withhold or ignore exculpatory evidence that, if taken into account, would void probable cause"). Accordingly, we reject this reason submitted by Espinoza for disturbing the District Court's ruling.

c.　　*Objective Reasonableness.* Finally, Espinoza urges that he is entitled to qualified immunity because a "reasonably competent officer could have concluded, based on the facts known at the time of arrest, that probable cause existed." *E.g.*, *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (internal quotation marks omitted).

Espinoza's conduct does not meet even that low bar. No competent officer would have crafted, as Espinoza did, a statement of medical reasons for which the three women visited Pourkavoos that excluded mention of almost all such issues that appeared remotely related to the procedures about which the women complained. No competent officer would have "improperly included his subjective beliefs," as the District Court observed that Espinoza did based on "discrepancies between the patients' recorded statements and their written statements as recited in the warrant application." App'x 124. We find that the record amply supports the District Court's conclusion that the information received by Espinoza failed to show that Pourkavoos's actions were *in*appropriate, and that Espinoza omitted most of the information that tended to explain Pourkavoos's actions from the Applications.

12

No competent officer would do that, nor should any officer be excused for doing so. No reasonably competent officer could have concluded, based on the facts shown by this record to have been known to Espinoza, that probable cause existed. We therefore see no legal error in the District Court's decision to deny qualified immunity at this early stage of the litigation.[10]

* * *

For the reasons set forth above, the District Court's order is **AFFIRMED**.

FOR THE COURT:<br>
Catherine O'Hagan Wolfe, Clerk of Court

---

[10] We reiterate that, because Espinoza brought his demand for qualified immunity as a motion under Rule 12(c) of the Federal Rules of Civil Procedure, our appraisal of these issues is based on the assumption that the allegations contained in Pourkavoos's complaint are accurate. A different picture—one that demonstrates Espinoza was indeed entitled to qualified immunity—might emerge from further development of the evidence.